Frank E. BERMAN, Rose R. Berman,
and Muriel Winston

v.

**NEW HAMPSHIRE JOCKEY CLUB,
INCORPORATED.**

Civ. A. No. 2855.

United States District Court
D. New Hampshire.

Oct. 31, 1968.

J. Fleet Cowden, Sudbury, Mass., Lawrence E. Spellman, Sulloway, Hollis, Godfrey & Soden, Concord, N. H., for plaintiffs.

Kenneth F. Graf, McLane, Carleton, Graf, Greene & Brown, Manchester, N. H., for defendant.

## ORDER GRANTING MOTION TO DISMISS

BOWNES, District Judge.

The plaintiffs have commenced this action under Federal Rule 23, purportedly as representative members of a class "comprising the licensed owners of * * * horses which * * * have won purses at Rockingham," a racetrack in Salem, New Hampshire, operated by the defendant-licensee. The plaintiffs allege, in substance, that the racetrack has failed to honor in full alleged annual purse agreements dating from 1933; that the violation of the agreements was fraudulently concealed from the plaintiffs; and that the total monies wrongfully withheld from the class exceeds four million dollars when computed over the thirty-four year period. Relief has been sought by way of an accounting, a permanent injunction against further unlawful withholding of monies, and a

declaratory judgment determining that the Horseman's Benevolent Protective Association (not named as a party to this action), is not, and has never been, the legal representative of the alleged class.

The defendant-licensee has moved to dismiss on four grounds:

1. lack of jurisdiction by reason of inadequate amount in controversy;

2. failure to state a claim upon which relief can be granted;

3. failure to join a party required by Federal Rule 19; and,

4. impropriety of the action as a class action under Federal Rule 23.

The Court concludes that the first and fourth grounds are dispositive and conclusive and that the motion to dismiss should be granted. A brief explanation and definition of the somewhat esoteric terms and conditions of the horse-racing establishment, both under New Hampshire law, and the operative procedures of the defendant-licensee (as evidenced by the record, uncontradicted statements, and testimony) is necessary to a proper understanding of our findings and rulings.

*Breakage.* The law of the State of New Hampshire (N.H.Rev.Stat.Ann. ch. 284) permits and the defendant presumably operates its racetrack under the so-called "Pari-Mutuel Pool" system of wagering. N.H.Rev.Stat.Ann. ch. 284: 22. Under this system, the licensee, the state, and the bettors share the total monies wagered in the approximate amounts of seven and one-half per cent, seven and one-half per cent, and eighty-five per cent, respectively.[1] The bettors' portion, however, proves slightly less than eighty-five per cent, as payment to winning ticket holders is made in multiples of ten cents (e.g., $6.60, $4.40, $2.20) and if the precise arithmetic amount due each bettor results not in a multiple of ten cents, but in odd cents (e.g., $6.68, $4.45, $2.23) the odd cents are added to the shares of the state and the licensee "fifty-fifty." This additional money (called "breakage") totals several hundred-thousand dollars per year[2] and a portion of the track's share of that "breakage" is the money damage sought by the plaintiffs in this action.

*Distribution Problems.* In addition to an understanding of the nature of "breakage," it is imperative that we outline the manner in which "purses" or money prizes are determined in amount and awarded to the race winners. First, at the beginning of each year (or racing season) a so-called "annual purse agreement" is entered into by the racetrack and the horseowners as a group.[3] By that agreement a certain percentage (currently 44.7%) of the track's annual share of money is promised to be paid (in yet undetermined portions) to the horseowners as a class. (Thus for each one-hundred dollars to be retained by the track during the forthcoming year, see footnote 1, supra, forty-four dollars and seventy cents is contractually prom-

1. The statute specifically prescribes that a "commission" of "fifteen per cent of each dollar wagered plus the odd cents of all redistribution [to the bettors] to be based upon each dollar wagered, exceeding a sum equal to the next lowest multiple of ten * * *" is to be divided equally between the state and the racetrack. N.H.Rev.Stat.Ann. ch. 284:22(I). The racetrack operational costs (overhead, etc.), profit, and the horseowners' prize monies (or "purses") are derived from the licensee's half-share of the "commission." In brief, the amount of that share is 7½% of total monies wagered plus 50% of "the odd cents * * * exceeding a sum equal to the next lowest

multiple of ten, known as breakage, * * *." N.H.Rev.Stat.Ann. ch. 284:22 (I).

2. The plaintiffs state in paragraph 10 of their complaint that the defendant's 50% share of breakage for the ten calendar years 1958–1967 aggregates $2,664,626.67.

3. No written contract is alleged or attached to the pleadings or memoranda. Both allegations and answers are vague on the entire matter of the "annual purse agreement." As a contract has been pleaded, however, and remains uncontradicted, we assume its existence and recite only alleged terms as are reasonably determinable from the record.

ised to the race winners.) No specific dollar amount is promised, of course, as the track's share of money (hence, the horsewinners' percentage of that share) must await the subsequent betting during the actual racing season.

Five times during the actual racing season at Rockingham "meet books" are published. A meet-book is actually a schedule of races and listing of dollar amounts ("purses") to be paid to the winners (and various "runner-up" positions) in each race scheduled for the next fifteen or so racing days.[4] The dollar amounts are based upon the track's *estimated* share of the *estimated* total "handle," i.e., the total of all monies wagered, or, gross receipts. No question has been raised concerning the payment of these published "purses." A problem does arise, however, if the "estimates" made prior to the meet prove to have been conservative (as is frequently the case). The *annual agreement* requires that 44.7% of the track's share of the "handle" be distributed to the race winners. If, then, the promised and paid "purses," when totalled, *do not* amount to that required percentage, additional distribution, over and above the "purses," must be, and is made to those winners.

The source of the plaintiffs' fundamental procedural difficulty arises from the fact that there is no formula of any kind to determine the manner, amount, or recipient of the additional monies due to the purse winners. The track licensee, in its sole and uncontrolled discretion, increases purses of its own choice. The argument of plaintiffs' attorney at a hearing on the motion (Record, at 17, 18, 19, 20, 22, 23, 25, 27), the plaintiffs' supplemental memorandum (pages 3–6), and the deposition

of Max L. White (taken on behalf of plaintiffs) (see pages 23, 42, 44, 45, 46) indicate that these extra payments may be made to any, or all, winners, with no determinative guide but the discretion of the licensee. Therefore, the first-place winner of the third race, the second-place winner of the fifth race, and the first-place winner of the tenth race might be chosen, without *contractual* injustice, to receive excess monies. (See note, 6, infra.) In other words, the track decides which purse winners are to share in the excess money, over and above the promised purses. The absolute discretionary aspect of the licensee's distribution of excess monies is a critical factor in our order in this case and must be understood: the money must be paid (by virtue of the annual percentage agreement)—the payee, however, as long as he is one, or more, of the purse winners, is chosen without obligation of contract, rule, or regulation—purely upon the mere whim of the licensee. We make no comment upon this practice, either legal or moral. Its existence, however, is critical to an understanding of the issue.

## THE ISSUE

The plaintiffs claim that the track's fifty per cent share of the "breakage" (as defined, supra) should be included in the computation of the purse winners' 44.7%—in other words, that payments to the purse winners must total 44.7% of 7½% of the gross "handle" PLUS 44.-7% of the "breakage" retained by the track.[5] It is their claim that the failure of the track (for thirty-four years) to include the "breakage" fund in the computation of the horseowners' monies is, and was, in breach of their agreement; that knowledge of this omission was fraudulently withheld from them by

---

4. No precise statistical evidence is available from the record as to the duration of a fifth portion of a "meet" or racing season. The Court presumes that this absence of precision results from the fact that the length of race meets may vary from year to year. See remarks of Mr. Graf, Record at 32.

5. An illustrative example may tend to clarify: Assume that a total of $100,000 was wagered in a single day. By statute, the track retains $7,500 *plus* half of the day's "breakage," perhaps, $100. The plaintiffs claim that the annual purse agreement entitles them to a 44.7% share of $7,600, rather than $7,500.

the track; and, that the track should now be held accountable to the plaintiffs in the amount of $4,168,808.42 (purportedly 44.7% of the track's retained breakage during the alleged period of wrongdoing.) Therefore, according to the plaintiffs' theory, the "matter in controversy" is well in excess of ten-thousand dollars, hence, clearly a sufficient jurisdictional amount under 28 U.S.C. § 1332(a). Impliedly, of course, the plaintiffs are treating the jurisdictional amount as the collective or aggregated sum allegedly due to the entire class.

By answer, the defendants deny to the plaintiffs the right to consider the aggregated amount as fulfilling the jurisdictional requirement, and maintain that each member of the plaintiff class must establish his own ten-thousand dollar claim, separate and distinct from the claim of any other plaintiff. Their argument is simple in terms: the plaintiffs are not a class under Federal Rule 23 and its preferable case law, and even if they were, they are not the type of class that can aggregate claims in diversity cases to satisfy the jurisdictional amount requirement of 28 U.S.C. § 1332(a).

Unfortunately, the argument is not as simple in substance as it seems in form. We are faced with the construction of a recently-amended, vaguely-defined, and hotly-contested federal rule. In addition, we are confronted with an issue of aggregation of claims, a problem born long before the federal rules, and certain to be extended in its eventual resolution. After diligent and painful study of the pleadings, papers, and hearings on the matter, and through exhaustive independent research *sua sponte,* we have concluded and so rule: that the pleadings of the plaintiff, on their face, have not established the jurisdiction of this Court. Further, in determining the jurisdictional question, we have found it necessary to delve into the propriety of the action as a proper class action under Federal Rule 23, and although our primary basis for dismissal is failure of jurisdiction, we must note the correlative involvement of considerations of Federal Rule 23 and will include so much of that consideration as we feel will lend clarity to our decision.

## ARGUMENT

### A. Jurisdictional Amount

The plaintiffs in the instant case make an uncontested allegation of diversity of citizenship. The jurisdictional statute upon which they rely requires, as well, that the "matter in controversy exceeds the sum or value of $10,000 * * *." 28 U.S.C. § 1332(a). Elementary as this recital may seem, we feel compelled to so state, for our inquiry into jurisdiction in this case finds its foundation in basic principles of federal jurisdiction: that as a prerequisite to litigation in a federal court, "a plaintiff 'must allege in his pleadings the facts essential to show jurisdiction. If he fails to make the necessary allegations he has no standing.'" Food Fair Stores v. Food Fair, 177 F.2d 177, 181 (1st Cir. 1949), citing McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). More specifically, "it is incumbent upon the plaintiff properly to allege the jurisdictional facts *according to the nature of the case.*" McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 182, 56 S.Ct. 782 (1936). [Emphasis added.]

"Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction *to the precise limits which the statute has defined.*" Healy v. Ratta, 292 U.S. 263, 270, 54 S.Ct. 700, 703, 78 L.Ed. 1248 (1934). [Emphasis added.] And the intensity of the policy of restriction of federal jurisdiction is clearly indicated by the successive acts of Congress regulating jurisdiction of the federal courts. Id. at 269. Further, the Court may inquire into the facts as they really exist, if lead to believe that its jurisdiction isn't

properly invoked. McNutt v. General Motors Acceptance Corp., supra, at 182, 56 S.Ct. 780.

■ Generally, a plaintiff's formal allegation that he has met the jurisdictional amount requirement is a sufficient jurisdictional pleading. However, when that allegation is traversed in the defendant's answer, the existence of jurisdiction becomes an issue of fact and requires the plaintiff to offer substantiation of his claim. KVOS v. Associated Press, 299 U.S. 269, 57 S.Ct. 197, 81 L. Ed. 183 (1936); Food Fair Stores v. Food Fair, supra. These principles we consider to be binding upon the Court and, "as there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court. * * *" Seth v. British Overseas Airway Corp., 329 F.2d 302, 305 (1st Cir. 1964), citing and quoting Gibbs v. Buck, 307 U.S. 66, 71, 72, 59 S.Ct. 725, 83 L.Ed. 1111 (1939). The fact that this action is brought under Federal Rule 23 as a class action permits no disregard of fundamental jurisdictional questions. Federal Rule 82 explicitly forbids the district court from extending statutory jurisdictional limitations in the construction of any rule. In this regard, see Snyder v. Harris, 268 F.Supp. 701 (D.C.Mo.1967), which expressly considers the construction of Rule 23 in the shadow of Rule 82. In the instant case, in addition to the formal allegation of jurisdictional amount, the plaintiffs have, in their complaint, alleged the accountability of the defendant to the class as a whole in the amount of approximately $14,168,808.42. This we hold to be the "matter in controversy" pleaded, and by the fact that no individual claims are pleaded, we can only proceed on the pleadings as we have them, i.e., that the amount in controversy is an aggregated amount, a cumulation of all the claims of all the plaintiffs in the alleged class of "licensed owners of * * * horses who have won purses" at the defendant's track. In deciding questions of jurisdiction, the pleadings must be read as a whole and the plaintiffs are held to their claim as pleaded. See Louisville and Nashville R.R. v. Mottley, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908); McNutt v. General Motors Acceptance Corp., supra; Food Fair Stores v. Food Fair, supra; cf. Horton v. Liberty Mutual Ins. Co., 367 U.S. 348, 81 S.Ct. 1570, 6 L.Ed.2d 890 (1961).

■ Regardless of the many comments upon the flexibility indicated by Federal Rule 23, as amended, we are, nevertheless, mindful of our own limited jurisdiction:

The settled rule is that when two or more plaintiffs having separate and distinct claims unite in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount; but when several plaintiffs unite to enforce a single title or right in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount. Pinel v. Pinel, 240 U.S. 594, 596, 36 S.Ct. 416, 417, 60 L. Ed. 817 (1915).

It is submitted that the federal rules have not abrogated this "*Pinel* doctrine," and under the principles discussed above, we are required to inquire into the nature of the claim alleged in the horseowners' complaint, to determine whether there exists "* * * a single title or right in which they have a common and undivided interest." See Snyder v. Harris, supra. The slightest excursion into the origin and history of equity jurisprudence, and the fifty-three year continued vitality of *Pinel*, clearly indicate that the representative suit was a sage old man before Federal Rule 23 was even an embryo. We do not mean to imply that Rule 23 and its amended 1966 version are without their own significance. The very length, breadth, and detail of Rule 23 in both versions indicate that the drafters (and subsequently the Congress) were well aware of the existence and utility of the class action. Indeed we note statements from every circuit of the practical value, equitable nature, and, frequently indispensable necessity of that rule. We must

note, however, that the first Rule 23 was ill-defined and subject to innumerable criticisms. See Frankel, J., Some Preliminary Observations Concerning Civil Rule 23, 43 F.R.D. 39 (1967). We also note the obvious vacuum in both the 1938 rule and the amended rule as to any mention of aggregation of claims or jurisdictional amount requirements. In light of the foregoing, we now rely heavily upon 28 U.S.C. § 1332(a), the *Pinel* decision, and Federal Rule 82 as fundamental guides to an admittedly challenging question of jurisdiction.

At first reading, the plaintiffs' complaint seems, without hesitation, to be the type of a claim which Rule 23 is aimed to foster. However, upon careful reading of the whole, we discover a most crucial and serious conflict: the fund sought as damages to the entire class is void of any possible identifying claim to any individual plaintiff. There is no allegation that *promised* purses went unpaid. The money now sought is excess or "bonus" money, with no set formula of distribution, but apportionable at the discretion and uncontrolled fractionalization powers of the track licensee. This factor obviously creates a critical jurisdictional issue.

Unlike a securities case where *each and every* defrauded member of a class is entitled to a portion of damages if the action prevails on the merits, the recovery to *any* plaintiff member of the alleged class here depends upon a condition subsequent: the approval of, or creation by this Court of a formula of distribution—in other words, the burden of fractionalizing over four million dollars falls entirely upon the Court, presumably acting as a track licensee, sole in its discretion, with the power to give or withhold, without guidelines of any kind.

Although the instant complaint states in Paragraph 4 that the amount due to the plaintiffs is easily ascertainable, the entire pleadings and papers indicate exactly to the contrary. In essence, we actually have a complaint which states that all, some, or, at the very minimum, one member of the plaintiffs' class is entitled to money damages. Further, no formula, or even suggested method of distribution has been disclosed to this Court. No one single plaintiff has a contractual right to any portion of the allegedly withheld monies. Not even the plaintiffs can claim such a right or that they will receive even a minute portion of the monies. [6]

 At this juncture we must return to our above-mentioned discussion of 28 U.S.C. § 1332(a), the *"Pinel* doctrine," and Federal Rule 82, which we rule are applicable here and lead to the inevitable conclusion that, under the circumstances of this case, there is no definable amount or matter in controversy. There is no one plaintiff, who, with any certainty or probability, will be entitled to a recovery of money damages. The entire determination of how, and to whom money damages are to be awarded amongst an undefined group of recipients is left to the trial court with only a vague and indefinite complaint purportedly establishing jurisdictional amount. We rule that jurisdiction is lacking, and the motion to dismiss must be granted on that ground.

*B. Propriety of This Action As A Class Action Under Federal Rule 23.*

 In view of the lack of controlling precedent and definitive rules as to the propriety of the maintenance of class actions (aside from the issue of aggregation of claims) and our belief that the type of money-damage allega-

---

6. In describing the method by which "breakage" money would purportedly be distributed, plaintiffs' attorney's remarks are worthy of note:

The way it would work is this: the track licensee, if it had available breakage money to be poured into winning purses, would have the right to say that it would go to the first race, third, fifth, seventh and tenth races, and eliminate the others. It could decide which races would participate in that breakage money. Remarks of Mr. Cowden, Record, at 18.

tion in this complaint is unique, to say the least, we feel it is appropriate for the Court to comment upon our correlative determination that the action here is improper because it fails to meet at least one express prerequisite for the allowance of an action under Federal Rule 23. The majority of cases and commentaries emphasize the broad discretion in the trial court upon this matter, and substantially support the rule that each required its own exercise of judgment. See Philadelphia Elec. Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E. D.Pa.1968); Berley v. Dreyfus and Co., 43 F.R.D. 397 (S.D.N.Y.1967); Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42 (S.D.N.Y.1966); Frankel J., op. cit. Under the circumstances in this case, the Court rules that (a) the alleged "class" does not exist, or alternatively, is too amorphously defined in relation to the relief requested to be treated as a "class"; and (b) that even if a class were sufficiently defined, conflicting interests between the members of that class effectively preclude the fulfillment of mandatory prerequisite 23(a)(4) of Federal Rule 23.[7]

### (a) The Non-Existence of A Class

■ Federal Rule 23 presupposes, but fails to define, the nature and existence of a "class." The "class" alleged by the plaintiffs, is all *horseowners who have also been purse winners.* However, when read in the light of the pleadings as a whole, the "class" must be more precisely defined as *the horseowners who have also been pursewinners, and who, by a subsequent determination of the Court will become entitled to a fractional portion of a fund allegedly withheld from the entire class.* In this respect, the requirement of an identity of interest, implicitly required by Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), for the maintenance of a representative suit, seems sadly lacking. Admittedly, there are cases which reject the requirement of precise definition of a class in terms of number and exact identity of every member. See, e. g., Fischer v. Kletz, 41 F.R.D. 377 (S. D.N.Y.1966) (relied upon by the plaintiffs in their memorandum as support for their claim of sufficient class definition).

■ But we must distinguish *Fischer* and other cases, in which *each* and *every* class member will be entitled to at least *some* beneficial recovery. Here it is indicated that no such potential recovery is by any means insured as to each of the purse winners. In fact, the record indicates that it is, as a practical matter, certain that at least some members of the "class" would fail to partake of a distribution. Record, pp. 32–34. See also Eisen v. Carlisle and Jacquelin, 391 F.2d 555 (2nd Cir. 1968). We agree with the reasoning in Berley v. Dreyfus and Co., supra, that the Court should not go out of its way to create a class without good reason. We feel that such a determination would effectively amount to an establishment of jurisdiction made by the Court in a purported Rule 23 action, a burden essentially required of the plaintiff. See Philadelphia Elec. Co. v. Anaconda American Brass Co., supra.

### (b) Antagonistic Interest Among Class Members

■ Federal Rule 23(a)(4) requires, *inter alia,* as a prerequisite to the maintenance of a class action, that "(4) the representative parties will fairly and adequately protect the interest of the class." Where, as here, the pleadings state the necessity of a subsequent fractionalization of the purported fund, with the money recovery to each class member uncertain and to be subsequently determined by a formula (the basis of which formula may well be presented by

---

7. Rule 23 of the Federal Rules of Civil Procedure, as amended, establishes four prerequisites to a class action, all of which must be established before a purported Rule 23 action may even be considered as appropriate. The failure, therefore, of just one of these prerequisites is necessarily fatal to the action as a whole.

the representative plaintiffs), we feel that there is explicit, internal conflict which renders impossible the prerequisite of Rule 23(a) (4). Indeed, Eisen v. Carlisle and Jacquelin, supra, relied upon heavily by the plaintiffs to support their claimed fulfillment of 23(a) (4), notes among the elements of adequate representation: typicality of claim and absence of antagonistic interest. We find that the pleadings in the instant case, specifically in their postulation of the random distribution pattern and theory, most emphatically establish that which they most hoped to avoid, and for these reasons, we feel no further consideration need be given to subsections (b) through (e) of Rule 23.

For the foregoing reasons, it is ordered that the present action be, and is hereby, dismissed.