414 F.2d 311
 Frank E. BERMAN et al., Plaintiffs, Appellants,
v.
NARRAGANSETT RACING ASSOCIATION, Inc., Defendant, Appellee.
Frank E. BERMAN et al., Plaintiffs, Appellants,
v.
BURRILLVILLE RACING ASSOCIATION, Inc., Defendant, Appellee.
Frank E. BERMAN et al., Plaintiffs, Appellants,
v.
The NEW HAMPSHIRE JOCKEY CLUB, INC., Defendant, Appellee.
 Nos. 7245-7247.
 United States Court of Appeals First Circuit.
 Heard March 5, 1969.
 Decided July 31, 1969.
 
 J. Fleet Cowden, Boston, Mass., with whom Frank E. Berman, Boston Mass., was on brief, for appellants.
 Stephen F. Achille, Providence, R. I., on brief, for appellee Narragansett Racing Assn., Inc.
 William A. Curran, Providence, R. I., with whom Jordan, Hanson & Curran, Providence, R. I., was on brief, for appellee Burrillville Racing Assn., Inc.
 Kenneth F. Graf and Charles A. DeGrandpre, Manchester, N. H., with whom McLane, Carleton, Graf, Greene & Brown, Manchester, N. H., was on brief, for appellee New Hampshire Jockey Club, Inc.
 Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.
 McENTEE, Circuit Judge.
 
 
 1
 These consolidated appeals are from dismissals of three class actions brought under Fed.R.Civ.P. 23 by plaintiffs as representatives of a class comprised of licensed owners of horses that have won purses at the defendants' race tracks.[1] Two of the suits were commenced in the district court in Rhode Island and the third in the district of New Hampshire. In all three the gravamen of the complaint is that for over three decades the defendants had failed to pay to the plaintiff pursewinners certain monies alleged to be theirs under annual purse agreements, and that this fact had been fraudulently concealed from them by the defendants. Plaintiffs pray for an accounting, injunctive relief, and damages in the amount of several million dollars.[2]
 
 
 2
 In each case the defendant moved to dismiss the complaint on four grounds: (1) the court lacks jurisdiction because the matter in controversy is not in excess of $10,000 within the meaning of 28 U.S.C. § 1332(a) (1); (2) the complaint fails to state a claim upon which relief can be granted; (3) plaintiffs fail to join an indispensable party under Fed. R.Civ.P. 19; and (4) plaintiffs do not state a proper class action under Fed.R. Civ.P. 23. Both courts dismissed the complaints for failure to make the jurisdictional amount and in addition, the New Hampshire district court found that plaintiffs' suit is not a proper class action.[3] These appeals followed.
 
 
 3
 No meaningful discussion of the issues can take place without a somewhat detailed recitation of how the race tracks operate under the "Pari-Mutuel Pool" system of wagering existent in both states. In Rhode Island the system is statutorily created and controlled by R.I.Gen.Laws 1956, §§ 41-1-1 to 41-4-13, as amended, and in New Hampshire by N.H.Rev.Stat.Ann. ch. 284:22. Under the system, patrons of the track who wish to bet on a particular race, purchase a ticket on a horse specifying whether the horse will win, run second (place) or third (show). The cash proceeds from the sale of the tickets, known as the "handle", are deposited in respective win, place or show pools. Before distribution to the winning bettors, however, the money in the pools is charged with a "commission" which is shared by the state and the track. This "commission" has two components: first, a certain percentage prescribed by statute is taken out; second, a certain amount known as the "breakage" is deducted. In Rhode Island, the statutory percentage is 16% of each dollar wagered, of which the state takes 8½% and the track keeps 7½%; in New Hampshire the percentage is 15%, of which the state and the track each take 7½%.
 
 
 4
 The "breakage" is computed as follows. After the statutory percentage is taken out, 84% or 85% of the pool (depending on the state) is left for distribution among the winning bettors. After the race the amount in each pool is divided by the number of winning tickets in the pool to determine the amount to be paid to each winning bettor. But under the statutes, after the winning tickets are divided into the pool according to class, payments per ticket are evened off to the next lowest dime. To use the Rhode Island district court's example, "a winning ticket that would have paid $4.43, had a precise division to the cent been carried out, actually pays $4.40 under the current statutorily authorized practice." Berman v. Narragansett Racing Ass'n, Inc., 293 F.Supp. 1258, 1260 (D.R.I.1968). The odd cents, known as the "breakage", are then divided equally between the state and track. This is no mean sum, being well over a hundred thousand dollars per year.[4]
 
 
 5
 By an annual purse agreement,[5] each track promises to pay 44.7% of its annual share to the group of owners whose horses win purses. The tracks have never interpreted this to include the breakage. Plaintiffs claim that under the annual agreements they are entitled to receive 44.7% of the track's share of the breakage as well as 44.7% of the track's share of the money wagered.
 
 
 6
 Although we do not reach the merits of that question here, the nature of the alleged purse agreements in matters other than the inclusion of the breakage are of central importance to a determination of the jurisdictional question. Although the agreements were not reduced to writing,[6] the district courts were able to make findings concerning them which we deem sufficient for our purposes.[7] Both courts found that the alleged agreements called for payments to be made to the group of owners whose horses win purses, and that distribution to individual members of the group was entirely discretionary with the track.[8] The New Hampshire court, for example, found that,
 
 
 7
 "the money must be paid (by virtue of the annual percentage agreement) — the payee, however, as long as he is one, or more, of the purse winners, is chosen without obligation of contract, rule, or regulation — purely upon the mere whim of the licensee." Berman v. New Hampshire Jockey Club, Inc., 292 F.Supp. 993, 996 (D.N.H.1968).
 
 
 8
 Turning to the question of jurisdiction, we note that any argument that plaintiffs may have made in the district courts that their claims individually exceed $10,000 has not been pressed on appeal. As stated in their briefs, they rely "solely upon aggregation on the jurisdictional issue." In order to succeed they must bring themselves within the latter half of the rule succinctly stated in Pinel v. Pinel, 240 U.S. 594, 596, 36 S.Ct. 416, 417, 60 L.Ed. 817 (1916):
 
 
 9
 "The settled rule is that when two or more plaintiffs having separate and distinct demands unite in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount; but when several plaintiffs unite to enforce a single title or right in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount."[9]
 
 
 10
 In Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), the Court stated that the doctrine of aggregation is based upon its interpretation of the statutory phrase "matter in controversy." The New Hampshire district court found that since no single plaintiff has a contractual right to a portion of the withheld money, there was no definable amount or matter in controversy. But "in determining the matter in controversy, we may look to the object sought to be accomplished by the plaintiffs' complaint; the test for determining the amount in controversy is the pecuniary result to either party which the judgment would directly produce." Ronzio v. Denver & R. G.W.R. Co., 116 F.2d 604, 606 (10th Cir.1940). An examination of the pleadings leaves no doubt that the object of these suits is to determine whether, under the annual agreements, the provision that entitles the class of pursewinners to 44.7% of defendants' share of the money wagered also entitles them to a like share of the breakage. All other objects of the action depend upon plaintiffs' ability to establish this right. The pecuniary result that the judgment would directly produce would be the awarding of a fund of several million dollars to the class. We think it is the amount of the entire fund, and not what each pursewinner's individual share will eventually be, that determines the amount in controversy here.
 
 
 11
 Further, the interest of the group of pursewinners in the asserted right is common and undivided. "It is not necessary that the claims of the plaintiffs be joint, in the technical legal sense of that word, as opposed to several. But it is essential that these claims constitute in their totality an integrated right against the defendant." A. Dobie, Federal Procedure § 58, at 158 (1928); Manufacturers Casualty Insurance Co. v. Coker, 219 F.2d 631, 633-634 (4th Cir. 1955). No contractual rights are created between the defendants and individual pursewinners,[10] and plaintiffs make no specific claims for individual payment.[11] As we view it, the case before us is analogous to a shareholder's derivative action or a suit against a trustee in which the sum, if recovered, would be paid into a corporate treasury or trust estate for later proportional distribution. See Dixon v. Northwestern National Bank, 276 F.Supp. 96 (D.Minn. 1967). Here, assuming the recovery of the fund, a formula must be established before the members of the class can benefit individually. See Manufacturers Casualty Insurance Co. v. Coker, supra, 219 F.2d at 634. There can be no doubt that plaintiffs' rights are "affected by the rights of co-plaintiffs." Cf. Eagle Star Insurance Co. v. Maltes, 313 F.2d 778, 781 (5th Cir.1963). Cf. Hedberg v. State Farm Mutual Automobile Insurance Co., 350 F.2d 924, 931 (8th Cir. 1965).
 
 
 12
 In principle, we think the instant case coincides with the following: New Orleans Pacific Ry. Co. v. Parker, 143 U.S. 42, 50-52, 12 S.Ct. 364, 36 L. Ed. 66 (1891); Manufacturers Casualty Insurance Co. v. Coker, supra; Brotherhood of R. R. Trainmen v. Templeton, 181 F.2d 527, 533 (8th Cir.), cert. denied, 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605 (1950); Miller v. National City Bank, 147 F.2d 798 (2d Cir.1945); Div. 525, Order of Ry. Conductors of America v. Gorman, 133 F.2d 273 (8th Cir. 1943); Eresch v. Braecklein, 133 F.2d 12 (10th Cir.1943); Grand Rapids Furniture Co. v. Grand Rapids Furniture Co., 127 F.2d 245 (7th Cir.1942); Boesenberg v. Chicago Title & Trust Co., 128 F.2d 245, 141 A.L.R. 565 (7th Cir. 1942); Phillips Petroleum Co. v. Taylor, 115 F.2d 726 (5th Cir.1940), cert. denied, 313 U.S. 565, 61 S.Ct. 941, 85 L. Ed. 1524 (1941); Haynes v. Fraternal Aid Union, 34 F.2d 305 (D.Kan.1929); Aero Design & Engineering Co. v. Oklahoma Employment Security Commission, 151 F.Supp. 844 (W.D.Okla.1956), aff'd, 353 U.S. 943, 77 S.Ct. 824, 1 L.Ed.2d 855 (1957). See Hedberg v. State Farm Mutual Automobile Insurance Co., supra. The fact that plaintiffs pray for a distribution is only ancillary to the primary relief sought and does not affect the amount in controversy or the integrated nature of plaintiffs' claim.[12] See Miller v. National City Bank, supra 147 F.2d at 800; Roland v. Jumper Creek Drainage Dist., 4 F.2d 719 (S.D.Fla.1925).
 
 
 13
 In cases contemplating the distribution of a fund, it has long been settled that one factor of considerable importance on the issue of whether the plaintiffs' interests are aggregable is whether the defendant has an interest in how the fund will be apportioned if plaintiffs prevail. Gibson v. Shufeldt, 122 U.S. 27, 30 L.Ed. 1248 (1887); The "Connemara", 103 U.S. (13 Otto) 754, 26 L.Ed. 322 (1880); Shields v. Thomas, 58 U.S. (17 How.) 3, 15 L.Ed. 93 (1854). Here, the defendants' only obligation would be to see that 44.7% of their share of the "breakage" is made available to the class. Under any formula that is finally adopted, defendants' liability is the same. The interests of the plaintiffs, vis a vis the matter in controversy, are "common and undivided" and the fact that their interests are separable among themselves is immaterial. Clay v. Field, 138 U.S. 464, 479-480, 11 S.Ct. 419, 34 L.Ed. 1044 (1891); 1 J. Moore's Federal Practice, § 0.97[3] at 891-92 (2d ed. 1964); see Bullard v. City of Cisco, 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254 (1933). Contrary to the opinion of the New Hampshire court, we think the fact that the amount of individual claims cannot be determined until the contract issue is settled and a formula established, is indicative of the integrated relationship of the pursewinners' interest.
 
 
 14
 In Shields v. Thomas, supra at 58 U.S. at 5, the Court made reference to a prior case in which several seamen brought suit for wages under a law permitting joinder and in which aggregation was denied. Oliver v. Alexander, 31 U.S. (4 Peters) 143, 8 L.Ed. 349 (1832). In distinguishing this case the Court said, "His contract is separate; and his recovery does not depend upon the recovery of others, but rests altogether on its own evidence and merits. And he does not recover a portion of a common fund to be distributed among the claimants, but the amount due to himself on his own separate contract." Similarly, other cases denying aggregation emphasize the separateness of the plaintiffs' claims. Clark v. Paul Gray, Inc., 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939); Alvarez v. Pan-American Life Insurance Co., 375 F.2d 992 (5th Cir.), cert. denied, 389 U.S. 827, 88 S.Ct. 74, 19 L.Ed.2d 82 (1967); Eagle Star Insurance Co. v. Maltes, supra; Hughes v. Encyclopedia Britannica, 199 F.2d 295 (7th Cir.1952); Pentland v. Dravo Corp., 152 F.2d 851 (3d Cir.1945); Andrews v. Equitable Life Assur. Soc. of the United States, 124 F.2d 788 (7th Cir.1941), cert. denied, 316 U.S. 682, 62 S.Ct. 1270, 86 L.Ed. 1755 (1942); Snyder v. Harris, 268 F.Supp. 701, 704-705 (E.D.Mo.1967), aff'd, 390 F.2d 204 (8th Cir.1968), aff'd, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). Demonstrably, the instant case is not a collection of individual lawsuits brought solely for the convenience of the claimants.
 
 
 15
 Although our decision on the jurisdictional issue requires reversal of the two Rhode Island cases, the New Hampshire district court's further determination that plaintiffs' suit was an improper class action under Fed.R.Civ.P. 23 requires separate consideration. The court reached this conclusion on two grounds: (1) the alleged class is non-existent, or at least too amorphously defined in relation to the relief requested to be treated as a class; (2) even if the class were sufficiently defined, conflicting interests between the members effectively preclude fulfillment of Rule 23(a) (4). But we think these are merely two branches of the same argument. See Giordano v. Radio Corp. of America, 183 F.2d 558, 560-561 (3d Cir.1950). Both are rooted in the fact that no distribution to the pursewinners can take place without a subsequent determination by the court. The New Hampshire court found that "it is, as a practical matter, certain that at least some members of the `class' would fail to partake of a distribution," and distinguishes those cases in which "each and every class member will be entitled to at least some beneficial recovery." Also, the court found that since the shares are uncertain, "explicit, internal conflict" is inevitable.
 
 
 16
 In our opinion this class is neither ill-defined nor ephemeral. We think it likely that in any lawsuit involving vast numbers of litigants, some of them, for a variety of reasons, may ultimately fail to take part in the distribution. It may be true that this is such a case. But that fact, which cannot be determined by prejudgment, should not penalize those who are entitled to share. To deny them the class action device because "as a practical matter" some may not share would defeat the purpose of the rule, i. e., to facilitate the joining of multiple small actions that would otherwise not be brought and to prevent repetitious litigation of claims.
 
 
 17
 This class is composed of a group of horseowners whose identities, plaintiffs allege, can be determined from track records. The class is certainly no less defined than was the class of "purchasers and sellers" of odd-lots on the New York Stock Exchange recognized in Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir.1968). Compare Fischer v. Kletz, 41 F.R.D. 377 (S.D.N.Y.1966) with Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y.1968). Nor do we regard plaintiffs' interests as antagonistic. Antagonism that defeats a class action must go to the subject matter of the suit. Redmond v. Commerce Trust Co., 144 F.2d 140 (8th Cir.), cert. denied, 323 U.S. 776, 65 S.Ct. 187, 89 L.Ed. 620 (1944). "The possible situation that the beneficiaries may have divergent views as to their several undivided rights in the distribution of a trust fund which is alleged to be insufficient to pay all in full does not prevent this being a class action. The preservation of the trust fund is the prime jurisdictional consideration * * *." Redmond at 151-152. Here, the prime consideration is the right to the fund: if plaintiffs prevail on that question, all members of the class will be benefited. Eisen v. Carlisle & Jacquelin, supra 391 F.2d at 562.
 
 
 18
 The judgments of the district courts are reversed and the cases are remanded for consideration of the other grounds for dismissal raised in defendants' motions.
 
 
 
 Notes:
 
 
 [1]
 Plaintiffs estimate that over the years involved in this litigation the class ranges from 5,000 to 8,0000 pursewinners and could be 400 to 500 pursewinners in any given year
 
 
 [2]
 The specific amounts sought are $3,690,580.07 against the Narragansett Racing Association (Rhode Island); $4,996,053.98 against the Burrillville Racing Association (Rhode Island); and $4,168,808.42 against the New Hampshire Jockey Club, Inc
 
 
 [3]
 Berman v. Narragansett Racing Ass'n, Inc., 293 F.Supp. 1258 (D.R.I.1968); Berman v. New Hampshire Jockey Club, Inc., 292 F.Supp. 993 (D.N.H.1968)
 
 
 [4]
 For example, in New Hampshire the breakage ranged from $200,000 to $300,000 a year during the ten year period from 1958-1967
 
 
 [5]
 The record shows that the annual agreements were negotiated with the tracks by a Rhode Island corporation known as the Horseman's Benevolent and Protective Association (HBPA) as agent for the horseowners. Plaintiffs allege in their complaints that the association was not the authorized agent for the owners and was without legal right or authority to contract for the class of pursewinners
 
 
 [6]
 The New Hampshire court states: "No written contract is alleged or attached to the pleadings or memoranda. Both allegations and answers are vague on the entire matter of the `annual purse agreements.' As a contract has been pleaded, however, and remains uncontradicted, we assume its existence and recite only alleged terms as are reasonably determinable from the record." 292 F.Supp. 993, 995 n. 3
 
 
 [7]
 Compare, Thomson v. Gaskill, 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951 (1942)
 
 
 [8]
 The practice at all the tracks, apparently, is to pay tentative purses during the year. These purses are based upon the track's estimate of its share of the gross receipts. If at year's end the amounts paid out in purses do not total the percentage required to be paid to the pursewinners under the annual agreement, the difference must then be made up. The parcelling out of this money is entirely discretionary with the track
 
 
 [9]
 Plaintiffs argued alternatively that even if their claims were separate and distinct, they could be aggregated under Fed.R. Civ.P. 23, as amended. During the pendency of this appeal, that argument was rejected in Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053 (1969)
 
 
 [10]
 Under the annual agreements, the tracks promise that to such of the owners as become winners, they will payas a group 44.7% of its share of the money wagered. The agreements do not say that each individual winner will share pro rata; they create no specific rights in any individual winner. It is apparent that plaintiffs' claims consist of an integrated right against the tracks which can best be enforced by a representative suit.
 
 
 [11]
 Only two statements in the lengthy complaints bear on this question: (1) the allegation that because of the existence of complete track records "the precise claim of any member of the plaintiffs' class * * * could be readily computed or determined, so that an orderly plan of distribution could be incorporated by the court * * *" and (2) the prayer "for distribution among the members of said class in such manner as the court shall direct." It should be understood, however, that the manner of framing the complaint does not entitle plaintiffs to aggregate their claims where for other reasons it is clear that their interests are separate and distinct
 
 
 [12]
 The fact that a formula of distribution must be be selected should the plaintiffs prevail on the merits, does not change the complexion of this suit. It is easily distinguished from the situation, as existed in Eagle Star v. Maltes,supra, where several persons injured in a single accident attempt to aggregate their claims in a suit on an insurance policy. There the right of each individual's recovery would differ widely depending on a subjective examination of his particular injuries, pain and suffering, etc. In the instant case once the formula is decided upon, we see no reason why distribution should present any more of a problem than, for example, damages decreed in a suit brought on behalf of all purchasers and sellers of "odd-lots" on the New York Stock Exchange. Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968).