**27 PUERTO RICAN MIGRANT FARM WORKERS**

v.

**SHADE TOBACCO GROWERS AGRICULTURAL ASSOCIATION, INC., & General Cigar Company.**

**Civ. A. No. 15243.**

United States District Court, D. Connecticut.

Jan. 10, 1973.

David M. Sheehan, Farmworkers Div., Neighborhood Legal Services, Inc., Springfield, Mass., Kevin Carey, Migrant Legal Action Program, Inc., Washington, D. C., James W. Zion, Neighborhood Legal Services, Inc., Hartford, Conn., for plaintiffs.

Aaron Nassau, Elsner & Nassau, Hartford, Conn., for defendants.

RULING ON MOTION TO DISMISS

CLARIE, District Judge.

The plaintiffs are 27 Puerto Rican migrant workers who allege a violation of the employment contract under which they labored in the tobacco fields of the Connecticut Valley this past summer. They are citizens of the Commonwealth of Puerto Rico. The defendants are the Shade Tobacco Growers Agricultural Association, a non-profit corporation organized under the laws of the State of Connecticut, whose membership consists of Connecticut and Massachusetts tobac-

co growers; and the General Cigar Corporation, a member of that Association.[1]

The events giving rise to the cause of action allegedly transpired during the 1972 tobacco growing and harvesting season which ended this past fall. Although the work season began in the early spring, this action was not commenced until August 10, 1972. At the present time, the plaintiffs are no longer employed by the Association's grower members, the season having ended and they, presumably, having returned to Puerto Rico.

Jurisdiction is alleged under 28 U.S.C. § 1331, relating to cases "arising under" the laws of the United States; under 28 U.S.C. § 1332, by virtue of diversity of citizenship; under the Wagner-Peyser Act of 1933, 29 U.S.C. § 49 et seq., and 28 U.S.C. § 1337; and under the Civil Rights Act, 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) and (4). The defendants have moved pursuant to Rule 12 of the Federal Rules of Civil Procedure to dismiss the complaint for lack of subject matter jurisdiction. The Court, having reviewed the various memoranda, affidavits, and exhibits filed in connection herewith, and having heard counsels' extensive oral arguments, grants the defendants' motion to dismiss.

### The Facts

The defendant Shade Tobacco Growers Agricultural Association (hereafter, the Association) recruits farm workers for its grower members who, in turn, operate farm labor camps at which workers are housed· and fed during the tobacco growing and harvesting season. The plaintiffs were recruited by the Association from the Commonwealth of Puerto Rico through the interstate labor recruitment system established pursuant to the Wagner-Peyser Act of 1933, 29

U.S.C. § 49 et seq. Under that system, the United States Employment Service of the Department of Labor provides supervision and assistance to federally-funded state counterparts which, in turn, must conform to federal standards. A potential employer seeking farm laborers first files with the State Labor Department a request for the desired number of employees. If the attempt to secure such employees from the local labor market is unsuccessful, a clearance order is routed through the United States Employment Service to state labor departments in those areas having an excess of farm labor. The clearance order, prepared by the Employment Security Agency of the state in which labor is in demand, sets forth the terms and conditions of employment offered by the party seeking to recruit labor.

The Commonwealth of Puerto Rico is an area in which there is generally an excess of farm labor. Consequently, clearance orders for such help are routinely transmitted to the Department of Labor of Puerto Rico. However, by virtue of Law No. 87 (June 22, 1962), Laws of the Commonwealth of Puerto Rico, prospective employers desiring to recruit Puerto Rican farm workers must, as a precondition to such recruitment, formalize a written agreement, containing certain guarantees designed to protect Puerto Rican workers from exploitation. Before a clearance order is processed and workers are permitted to be sent from Puerto Rico, the agreement required by Law No. 87 must be approved by the Secretary of Labor of that Commonwealth.

The present controversy focuses upon one paragraph of said agreement which was entered into between the defendant Association and the Secretary of Labor

---

1. The General Cigar Company, a corporation organized under the laws of the State of New York and authorized to do business in Connecticut, is the only member of the defendant Association named as a party defendant. It employed 22 of the 27 parties plaintiff. The remaining five were employed by other growers: Meyer & Mendohlson (1); Hartman Tobacco (1); O. J. Thrall (2); and I. W. Woodworth (1).

of Puerto Rico.[2] Article 6C thereof provides:

"The Association and/or the Grower shall provide to the worker three (3) adequate hot meals per day at cost but not to exceed Two Dollars and thirty-three cents ($2.33) tax included. The worker agrees to pay such amount weekly."

The plaintiffs assert that the defendants breached this provision of the agreement, in that they have not provided the three adequate hot meals per day. The noon-time luncheon meal, which usually is consumed by the workers on the job while in the fields, consists of cold meat sandwiches, with hot soup being made available only to those workers who have supplied themselves with thermos bottles at their own expense.

Plaintiffs' counsel represent that the issue is much more fundamental than even they had initially appraised it. Puerto Ricans, they submit, are "little people" whose native culture has accustomed them to large, hot noon-time meals and whose physical stature is such that their health and well-being will not withstand the rigors of strenuous manual labor unless such hot meals are provided. Despite the defendants' representations that it was not until very recently that such a provision has been included within such contracts, the plaintiffs contend that it is "unthinkable" for a Puerto Rican to engage in strenuous physical labor without a hot noon-time meal.[3] Moreover, in their verified complaint, the plaintiffs have alleged that the food provided was nutritionally inadequate and that the defendants never intended to comply with the aforesaid provision of the agreement.[4]

Alleging irreparable harm, the plaintiffs seek certification for a class action, which might include as many as 1200 plaintiffs, and request the following relief: (1) a preliminary and permanent injunction restraining the defendants from violating Article 6C of the agreement; (2) compensatory damages; (3) an order directing the defendants to reimburse all monies charged for food under the agreement in excess of cost and; (4) punitive damages in the amount of $25 for each plaintiff and every member of the class they represent.

### The Law

The court is not unmindful of the peculiar needs and problems with which migrant farm workers are faced. However, viewed individually, and in proper perspective, the claim of each individual plaintiff[5] falls well below the jurisdictional amount requirement of 28 U.S.C. §§ 1331 and 1332. Those sections require that the matter in controversy

---

2. That agreement was negotiated between the Secretary of Labor of Puerto Rico and the defendant Association, which signed the agreement as the "employer." By its terms, however, the individual growers to whom such workers are assigned must execute a separate document agreeing to be bound by the agreement. Additionally, they must be approved by the Secretary of Labor of Puerto Rico. Article 1, A, 3.

3. The impact of this allegation is significantly diminished by the fact that the Secretary of Labor of Puerto Rico, in a letter dated March 3, 1972, stated that "[w]ith respect to Article 6C, the requirement of a hot lunch may be satisfied by providing appropriate thermos containers, available to the workers at cost, and providing a hot luncheon item supplementing present lunch arrangements." Appendix "A," defendants' mem-

orandum in support of motion to dismiss.

4. Paragraphs 18 and 31, Amended Complaint.

5. The availability of punitive damages is dependent upon state law. Wright, Federal Courts, § 33, at 112 (1970). It is extremely questionable whether, in a case such as this, punitive damages would be available. See Triangle Sheet Metal Workers v. Silver, 154 Conn. 116, 127–128, 222 A.2d 220 (1966); Givens v. W. T. Grant Co., 457 F.2d 612, 614 (2d Cir. 1972). Even assuming the availability of such damages, however, the monetary claims of each individual plaintiff would still, to a legal certainty, fall well below the jurisdictional amount requirement. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 288–289, 58 S.Ct. 586, 82 L.Ed. 845 (1938); Deutsch v. Hewes St. Realty Corp., 359 F.2d 96, 99 (2d Cir. 1966).

exceed "the sum or value of $10,000 exclusive of interests and costs. Moreover, such claims may not be aggregated in order to meet the jurisdictional amount requirement.

The circumstances under which claims may be aggregated are set forth in Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). There the issue presented was whether, in view of the 1966 amendment to Rule 23 of the Federal Rules of Civil Procedure, separate and distinct claims asserted by various claimants in a class action should be added together to meet the required jurisdictional amount. In reaffirming the traditional interpretation of the statutory phrase "amount in controversy," the Court held aggregation to be impermissible except:

"(1) in cases in which a single plaintiff seeks to aggregate two or more of his own claims against a single defendant and (2) in cases in which two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest." 394 U.S. at 335, 89 S.Ct. at 1056.

■ The first criterion set forth in *Snyder* is clearly inapplicable in the present case, and the Court is not persuaded by the plantiffs' argument that they have united to enforce a single right or title in which they have a common or undivided interest. The fact that the rights of each plaintiff are embodied in a single instrument ·giving similar rights to all plaintiffs, and the fact that each plaintiff has a common concern in compliance with the terms of the agreement, does not make common and undivided those rights which are otherwise several and distinct.[6] The essence of the plaintiffs' argument is that they are asserting a single right to a fund consisting of the aggregate amount by which all members of the plaintiff class were allegedly overcharged by the

defendants for the food they received. Accordingly, they submit that it is the amount of the entire fund that determines the amount in controversy.

The Court is not persuaded by this argument and finds the plaintiffs' reliance on Berman v. Narragansett Racing Association, 414 F.2d 311 (1st Cir. 1969), cert. denied, 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681 (1970), to be misplaced. In that case, the plaintiff class consisted of race horse owners who were entitled to a percentage of the profits earned by the defendants' racetracks. In examining the agreements under which the monies were claimed, the Court focused upon the nature of the right asserted and stated that, "[u]nder the annual agreements, the tracts promise[d] that to such of the owners as become winners, they will pay *as a group* 44.7% of its share of the money wagered." 414 F.2d at 315, n. 10 (emphasis original). It was in this context that the Court held, "it is the amount of the entire fund, and not what each pursewinner's individual share will eventually be, that determines the amount in controversy . . . ." 414 F.2d at 315. In light of Snyder v. Harris, *supra, Berman* cannot be read as holding that the existence of a fund determines the nature of the right asserted, for such a reading would permit what *Snyder* has prohibited. Rather, the right asserted in *Berman* was joint and undivided because the right asserted belonged to the group as a whole, and the individual members of the class had no rights to sue on the contract in question. Weiss v. Sunasco, 316 F.Supp. 1197, 1201 (E.D.Pa.1970).

Various provisions of the contract here in question indicate that each worker does possess distinct and divisible personal rights which exist apart from those accruing to his co-workers. The contract provides:

"This work agreement is entered into . . . by and between the under-

---

**6.** "Aggregation of the plaintiffs' claims cannot be made merely because the claims are derived from a single instrument, Pinel v. Pinel, 240 U.S. 594, 36 S.Ct. 416, 60 L.Ed. 817, or because

the plaintiffs have a community of interest, Clark v. Paul Gray, Inc., 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001." Thomson v. Gaskill, 315 U.S. 442, 447, 62 S.Ct. 673, 86 L.Ed. 951 (1942).

signed employer and the Workers whose names are annexed hereto." Article 1, B.

"No term of this agreement may be modified, amended, waived, or extended, nor may any addition be made without the express written agreement of the Worker . . . ." Article 1, E.

"Nothing herein contained shall be deemed to limit the right of the Worker to institute legal action under this Agreement in any competent court of the state in which the Association or Grower is located." Article 10, D, 2.

Thus, each worker is a party to the contract; each worker may sue under the contract; and a waiver, modification, or amendment executed by one worker will not alter the rights of the others.

■ The Court finds that these rights of the individual plaintiffs are separate and distinct and that the aggregation of claims is impermissible under Snyder v. Harris, *supra*. The amount in controversy, therefore, must be determined by reference to the claims of each plaintiff, rather than by reference to the total detriment to the defendants. Lonnquist v. J. C. Penney Co., 421 F.2d 597 (10th Cir. 1970). This approach is in accord with Givens v. W. T. Grant, 457 F.2d 612 (2d Cir. 1972) and Zahn v. International Paper Co., 53 F.R.D. 430 (D.Vt.1971), aff'd, 469 F.2d 1033 (1972).

■ This conclusion is not altered by the petitioners' request for injunctive relief. The plaintiffs cite Rosado v. Wyman, 304 F.Supp. 1356 (E.D.N.Y. 1969), aff'd, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), and Marquez v. Hardin, 339 F.Supp. 1364 (N.D.Cal. 1969), and rely upon the well established principle that, in injunction actions, the amount in controversy is the value of the right to be protected or the extent of the injury to be prevented. 1 Barron & Holtzoff (Wright ed.), § 24, at 111–112. The plaintiffs represent that they will

suffer harm in excess of the jurisdictional amount unless injunctive relief is granted. However, since the plaintiffs are no longer employed by the defendants, the Court finds that the issuance of injunctive relief would neither protect the plaintiffs' rights nor prevent their further injury. Viewed in its proper perspective, the present claim is one for damages resulting from an alleged breach of contract. Jurisdictional amount, therefore, should be measured by the amount of damages which the plaintiffs may in good faith claim, rather than by the detriment to the defendants of carrying on an activity which has ceased, or the value to the plaintiffs of protecting a right not currently being violated.

Citing Gomez v. Florida State Employment Service, 417 F.2d 569 (5th Cir. 1969), the plaintiffs urge that jurisdiction exists through implication under the Wagner-Peyser Act of 1933, 29 U.S.C. § 49 et seq., and 28 U.S.C. § 1337.[7] The Court is not persuaded. The two most significant differences between *Gomez* and the present case are that the plaintiffs in *Gomez* had no other remedy available to them, as has been suggested in Chavez v. Freshpict Foods, Inc., 456 F.2d 890 (10th Cir. 1972), cert. denied, 409 U.S. 1042, 93 S.Ct. 535, 34 L.Ed.2d 492 (1972); and in *Gomez*, the conditions to which the plaintiffs were subjected clearly existed in violation of specific federal regulations.

Alternative remedies are available to these plaintiffs. Article 10, D, 2 of the Agreement indicates that the workers have the right to institute legal action under the Agreement; Article 10, D, 1 permits suit to be brought in the Courts of Puerto Rico for all purposes of enforcement of the agreement; Article 10, B requires that the defendant Association post a performance bond, and the defendants represent that they have done so; Article 10, A, 1 gives the Secretary of Labor of Puerto Rico a right of action to enforce the agreement; Ar-

---

7. 28 U.S.C. § 1337 provides that "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce. . . ."

ticle 3 of the Agreement permits the Secretary of Labor of Puerto Rico to withdraw "approval" from any grower who violates either the letter or the spirit of the agreement. While there is nothing to suggest that the action of an administrative agency in cutting-off federal funds to a state agency which has failed to comply with the Wagner-Peyser Act or its regulations would be of any direct benefit to plaintiffs, there is nothing whatever to indicate that the plaintiffs' interests could not fully be protected by resort to the state court system.

■ Statutory wording militates against the implication of private civil remedies where conduct results in disqualification for certain benefits, but is not declared "unlawful." Spirt v. Bechtel, 232 F.2d 241, 250 (2d Cir. 1956) (concurring opinion of Judge Lumbard); and federal civil remedies are not lightly implied where alternative remedies exist. McFaddin Express, Inc. v. Adley Corp., 346 F.2d 424, 426 (2d Cir. 1965), cert. denied, 382 U.S. 1026, 86 S.Ct. 643, 15 L.Ed.2d 539 (2d Cir. 1965). In this regard, it has been noted that

> "where states offer some form of redress, the generally more extensive trial court resources at the state level militate against creating a federal remedy which is likely to attract a large quantity of litigation." Note, Implying Civil Remedies from Federal Regulatory Statutes, 77 Harv.L.Rev. 285, 292 (1963).

The paucity of reported decisions which have arisen under the Wagner-Peyser Act does not provide a reliable indicator of the amount of litigation which would result from an application of Gomez to the present factual situation. Although these considerations were enunciated in the context of an initial decision as to whether or not a federal remedy should be implied, they apply with equal vigor to a decision as to whether there should be an extension of an implied remedy to a different factual situation.

The second significant difference between Gomez and the present case is that here the applicable federal regulations are silent as to food.[8] In Russo v. Kirby, 453 F.2d 548 (2d Cir. 1971), striking communications workers whose welfare payments had been terminated alleged that their claims for state welfare arose under an Act of Congress regulating Commerce. The Court distinguished the factual situation before it from Gomez, stating that in Gomez the claim arose "directly" under the statute involved. 453 F.2d at 551. The Court stated:

> "Jurisdiction under § 1337 does not attach on the bare assertion that a right under an act regulating commerce is infringed. Facts must be alleged to show that federal law in the particular case creates a duty or remedy . . . . This, of course, is the requirement, so frequently referred to, that a case arise 'directly' under federal law. . . . As Professor Wechsler has said, 'Though the decisions are not free from vacillation, their essential purpose is to hold the meeting of the statute limited to cases where the plaintiff's cause of action, the rule of substance under which he claims the right to have a remedy, is the product of federal law.' " 453 F. 2d at 551.

The Court in Russo concluded that Gomez arose "directly" under federal law because the violation of federal regulations gave the plaintiffs a right to a remedy. The rule of substance under which these plaintiffs claim a right to a remedy is not a product of federal law. It is a private agreement which is required by neither the Act nor the regulations enacted pursuant thereto. Their claim does not arise directly under federal law, since neither the Act nor the federal regulations creates a "duty," or provides a "remedy" with respect to the matter here in controversy.

8. 20 C.F.R. § 602.9.

■ Moreover, no distinctive policy of the Wagner-Peyser Act requires that federal principles control the disposition of the plaintiffs' claim. Viewed in proper perspective, their claim is for the breach of a simple employment contract. An examination of the legislative history of the Wagner-Peyser Act indicates that a basic objective of the Act was to promote cooperation between the states and the federal government in a general effort to bring men and jobs together. The debates in the House of Representatives [9] indicate that the Act was designed to afford workers protection, particularly from private employment agencies which often exacted high fees for securing employment for them. There is nothing in its legislative history to indicate a legislative intent or desire to bring within the scope of federal regulation all disputes involving migrant laborers and employers who benefited from the Wagner-Peyser system.

In Ivy Broadcasting Co., Inc. v. American Telephone and Telegraph Co., 391 F.2d 486 (2d Cir. 1968), the Court considered whether a remedy under the Communications Act of 1934, 47 U.S.C. §§ 206 and 207, existed for a claim in tort and contract stemming from the alleged misperformance of a service affecting commerce. Although that Act provided a more substantial basis for the implication of a remedy than exists in the present case, *see* Note, 82 Harv. L.Rev. 479, 480 (1968), the Court stated:

"Nor do we think that such a remedy should be 'inferred' from the Act; there is no reason to believe that Congress, in the Communications Act, intended to declare the existence of the fundamental right to recover for tort or breach of contract." 391 F.2d at 489.

A fair reading of the Clearance Order [10] under which the plaintiffs were recruited reveals an interplay between that document and the agreement in question. However, the agreement was not required by the Clearance Order, nor was it required by the Act or the regulations. Rather, it was required by, and executed pursuant to, Law No. 87 of the Commonwealth of Puerto Rico.

■ As a last resort, the plaintiffs would rely upon 42 U.S.C. § 1983 [11] and 28 U.S.C. § 1343(3) and (4).[12] However, the Court finds that these Civil Rights Statutes do not confer jurisdiction over the subject matter. State action is a prerequisite to an action arising under these sections. The miniscule degree of state involvement in the present case is insufficient to maintain such an action. There is nothing here approaching the symbiotic relationship between lessor and lessee, which existed in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); there is no insinuation between state and private interests such as existed in Eaton v. Grubbs, 329 F.2d 710 (4th Cir. 1964) and Hampton v. City of Jacksonville, 304 F.2d 320

9. 77 Cong.Rec. 4766–4783 (1933).

10. Plaintiffs' Exhibit 3, p. 3.

11. 42 U.S.C. § 1983, provides in pertinent part:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity . . . ."

12. 28 U.S.C. § 1343, provides in pertinent part:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person . . .
(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by . . . any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights . . . ."

(5th Cir. 1962); and there is no channeling of federal funds through a state agency to a private individual such as was present in Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963). The only issue is the construction or interpretation of a simple employment contract allegedly breached by private defendants.

■ Private action is not transformed into state action simply because the actor has received a benefit from the state. The benefit in the present case is certainly no greater than that which existed in Moose Lodge No. 17 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), where the Court held that the defendant's refusal to serve Negroes was not state action, even though a state agency had licensed the defendant to sell liquor.

The rights which the plaintiffs assert have been violated are in fact contract rights which do not arise out of, and are not secured by, any federal law or regulation.

The complaint is dismissed for lack of subject-matter jurisdiction. So ordered.