Theresa **MARQUEZ** et al.,
Plaintiffs,

v.

Clifford M. **HARDIN** et al.,
Defendants.

Civ. A. No. 51446.

United States District Court,
N. D. California.

Sept. 5, 1969.

Robert L. Gnaizda, California Rural Legal Assistance, San Francisco, Cal., Harry E. Woolpert, San Luis Obispo, Cal., and Burton D. Fretz, Santa Maria, Cal., Dennis Powell, Salinas, Cal., for plaintiffs.

William B. Spohn, Asst. U. S. Atty., San Francisco, Cal., Richard L. Mayers, Deputy Atty. Gen., Sacramento, Cal., Harland F. Leathers, Chief, Gen. Litigation Section, Civil Div. Dept. of Justice, Washington, D. C., for defendants.

## OPINION AND ORDER

PECKHAM, District Judge.

Plaintiffs seek a preliminary injunction enjoining the Secretary of Agriculture and other federal defendants from "failing or refusing to enforce their statutory duty to ensure that all needy [school] children . . . participating in the National School Lunch Program be provided with a free or reduced-price school lunch . . . and from failing and refusing to issue standards of eligibility in accordance with Federal-State minimal survival guidelines and their statutory duties." The application for preliminary injunction is supported by numerous affidavits of parents and children indicating that some children who cannot afford the present lunch (approximately thirty-five cents) are going hungry.

The Defendants resist the preliminary injunction and move to dismiss the complaint, or in the alternative, for summary judgment on the grounds that

1. The Secretary of Agriculture has no such duty;

2. The court does not have jurisdiction to entertain the suit; and

3. An indispensable party is lacking.

## I. PRELIMINARY INJUNCTION

The United States Court of Appeals for the Ninth Circuit has said of preliminary injunctions:

[T]he usual function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits. The hearing is not to be transformed into a trial of the merits of the action upon affidavits, and it is not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial. This is particularly true where the relief afforded, rather than preserving the status quo, completely changes it.

. . . . . .

It has been said, and we agree, that: "The status quo is the last uncontested status which preceded the pending controversy."

. . . . . .

We are not to be understood as stating that the foregoing principles are hard and fast rules, to be rigidly applied to every case regardless of its peculiar facts . . . it is to be guided by the principles long established in courts of equity, and a departure from those principles is justified only where the practicalities of the problem with which the court is faced require it. Tanner Motor Livery, Ltd. v. Avis, 316 F.2d 804 (9th Cir. 1963).

The present case is not one where people receiving welfare are being threatened with termination. In this case the status quo is that those allegedly unable to pay must pay approximately thirty-five cents for school lunches. The prayer for relief would alter this situation by causing the Secretary of Agriculture to ensure that these children receive free or reduced price lunches. Consequently, the preliminary injunction would not only alter the status quo, but would give the plaintiff substantially all the relief prayed for.

The *Tanner* court does not give any hint as to when the "practicalities of the problem with which the court is faced" would require a departure from this principle. It might be argued that the instant situation would require such a departure because without the preliminary injunction the contracts for the 1969–70 school year will be let and no change could be made for a full year should the plaintiffs prevail. The contract, however provides that it may be terminated on thirty days notice by either party so that any judgment could be made effective within thirty days. (Federal-State School Lunch Act Agreement No. 12–25–010–7430; p. 1 at para. 5.) A preliminary injunction, therefore, should not issue.

## II. MOTION TO DISMISS

A. The relevant statutes are as follows:

42 U.S.C. § 1751 provides in substance that the Secretary of Agriculture is authorized to:

* * * encourage the domestic consumption of nutritious agricultural commodities and other food, by assisting the States, through grants-in-aid and other means, in providing * * * for the establishment, maintenance, operation, and expansion of nonprofit school-lunch programs.

States which wish to participate in the program must agree to match each dollar the Secretary makes available to assist them with three dollars "from sources within the State determined by the Secretary to have been expended in connection with the school-lunch program under this [Act]." 42 U.S.C. § 1756. Further provision is made for decreasing the State's matching funds if a State's per capita income is below the per capita income of the United States. 42 U.S.C. § 1756.

Participating states in turn disburse the school-lunch program funds via the State educational agency

* * * to those schools in the State which the State educational agency, taking into account need and attendance, determines are eligible to participate in the school-lunch program. 42 U.S.C. § 1757.

The Act further provides that the lunches served by schools participating in this Program "shall be served without cost or at a reduced cost to children who are determined by local school authorities to be unable to pay the full cost of the lunch." 42 U.S.C. § 1758.

42 U.S.C. § 1760(a) provides:

State educational agencies, and schools participating in the school-lunch program under this chapter shall keep such accounts and records as may be necessary to enable the Secretary to determine whether the provisions of this chapter are being complied with.

7 C.F.R. § 210.8(d) provides:

Schools selected for participation shall enter into a written agreement with the State Agency. . . . Such agreement *shall* . . . provide that the school shall:

. . . . . .

(5) supply lunches without cost or at reduced price to *all* children who are determined by local school authorities to be unable to pay the full price thereof; (6) make no discrimination against any child because of his inability to pay the full price of the lunch. [Emphasis added.]

In a "notice" dated October 18, 1968, 33 Fed.Reg. 15674, the acting Secretary of Agriculture set forth criteria which State agencies or CFPDOs must meet by July 1, 1969 in order to qualify for a government grant. The notice provides, inter alia:

III. Each State agency, or CFPDO where applicable, shall:

. . . . . .

2. Require such schools and service institutions to:

a. Develop a written policy stating the criteria to be used uniformly in all attendance units under their jurisdiction in determining the eligibility of children for free or reduced price meals.

. . . . . .

c. Include in their policy statements, criteria which will give consideration to economic need as reflected by family income, including welfare payments, family size, and number of children in the family in attendance units.

IV. [I]t is suggested that each State agency, or CFPDO where applicable, shall:

. . . . . .

3. Recommend that schools and service institutions consult with welfare agencies concerning eligibility scales for public assistance in the local area and information on families participating in any of the local welfare programs. This will minimize additional

developmental work and assure greater coordination and understanding within the community. A broad range of public opinion exists which generally considers families are in need of food assistance if they are at income levels that qualify them for various forms of economic assistance such as "welfare" programs. Therefore, free or reduced price meals should be provided to children from any family certified as eligible for assistance under the Food Stamp Program or the Commodity Distribution Program and children from families participating in any of the various programs of public assistance such as Aid for Dependent Children as well as families determined to be eligible under local standards related to local conditions.

**B. Jurisdiction.**

There are three possible bases of jurisdiction and each presents certain problems. Each of them must in turn be examined since obviously if this Court is without jurisdiction the cause must be dismissed.

**1. 28 U.S.C. § 1361. Mandamus.**

■ Plaintiffs contend that these regulations are an insufficient fulfillment of the Secretary of Agriculture's duty under the Act to give reduced price or free lunches to needy children because it is merely precatory. The plaintiffs want the defendants to be enjoined from failing to insure that all needy children in California who participate in the program get reduced price or free lunches. Although cast in terms of a restraining injunction, the request for relief is actually a mandatory injunction, and a mandatory injunction against a public officer forcing him to perform a duty under a statute is "in the nature of mandamus" within the meaning of 28 U.S.C. § 1361. *Cf.* Johnson v. Interstate Power Co., 187 F.Supp. 36 (D.S.D.1969).

■ Section 1361 vests this Court with jurisdiction since plaintiffs' complaint is an effort to compel "an officer . . . of the United States . . . to perform a duty owed to the plaintiff."

The legislative history of the statute makes it clear that Congress' primary intention was to expand the availability of the remedy as it then existed rather than to expand the scope of the remedy. 2 U.S.Code Cong. and Admin.News, p. 2784 (1962). See White v. Adm'r. of General Services Administration, 343 F. 2d 444 (9th Cir. 1965). [Prior to 1962 it had been held that as the result of historical accident, mandamus and even equitable mandatory relief could only be had against the United States in the District Court for the District of Columbia. The matter is presented in some detail in 3 K. Davis, Administrative Law Treatise § 23.10 (1958).] Since the remedy was not intended to be expanded by § 1361, the question arises as to the extent to which strict regard must be had for the ancient complexities of the law of mandamus.

■ Professor Davis makes a very convincing showing that the traditional "ministerial-discretionary" distinction in mandamus law was the result of misinterpretation of early Supreme Court cases and, more importantly, that the distinction has been productive of much mischief and, therefore, often has been disregarded by the Supreme Court. 3 K. Davis, *supra* at § 23.11 and especially the discussion of Robertson v. Chalmers, 341 U.S. 37, 71 S.Ct. 547, 95 L.Ed. 726 (1951), at 357–60. Nonetheless, a very substantial body of precedent supports the ministerial-discretionary distinction in one fashion or another and this Court does not feel free simply to ignore it. However, this does not mean that we must blindly follow ancient rules to absurd or unjust conclusions. The question of whether a particular matter is ministerial or discretionary is itself a question of law for the Court to decide. It is apparent that the former category has often been stretched to reach a just result. 3 K. Davis § 23.11 at 354–56, citing Wilbur v. United States ex rel. Krushnic, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930).

Professor Byse, an architect of § 1361, is in full accord with Professor Davis

on simplifying and minimizing the limitations on mandamus and on limiting or preventing the application of mandamus principles to equitable relief of all varieties. Byse, Section 1361 of the Mandamus and Venue Act of 1962 and "nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L. Rev. 308 (1967). In this article Byse states (at 332–33):

> Properly understood, the notion that mandamus principles should govern the availability and scope of review in an action for mandatory injunctive or declaratory relief merely restates the rule that an officer's valid exercise of a delegated power will not be controlled by the judiciary. The crucial issue in all cases is the scope of the delegated power. The superiority of the equitable tradition stems from the fact that in actions applying equitable principles "courts and counsel typically focus immediately upon merits," that is, the scope of the delegated power, whereas in cases applying mandamus principles, analysis often is clouded by the ministerial-discretionary distinction and other technicalities of mandamus law. [Footnotes omitted].

Byse, *supra*, at 332–33.

Without going further into the complexities of this issue, it is apparent that whatever view we take of the ministerial-discretionary distinction, the statute must be examined to determine the scope of the Secretary's discretion.

■ Looking at the statute, it is fair to say that if the Secretary of Agriculture learns that federal funds are being applied in a manner substantially different from the congressional mandate, it is his duty to in some way remedy the situation. The statute says that the free or reduced price lunches "shall" be served to needy children and that the local agencies shall keep records "as may be necessary to enable the Secretary to determine whether the provisions of this chapter are being complied with." 42 U.S.C. §§ 1758, 1760(a). If the local agencies fulfill their obligation to determine who is needy, then the Secre-

tary need do nothing. If it is brought to his attention that the States are misapplying the funds he should take steps to insure that either the funds are applied correctly or terminated. Exactly in what manner he does the latter is the area in which he has discretion, because the statute does not spell out any specific method to insure compliance. This analysis also places the primary responsibility for compliance on the States because they are given the first opportunity to comply.

Since in any situation where factual determinations are involved some mistakes will inevitably be made, the Secretary would only have to take remedial measures if the state administration were to vary in a substantial way from the Congressional mandate. The allegations and affidavits of the plaintiffs, if true, would probably constitute such a variation. When this situation was brought to the Secretary's attention he took remedial steps by way of the "notice" in 33 Fed.Reg. 15674 discussed above. Since the Secretary has considerable discretion in bringing about compliance, and could reasonably believe that the method adopted is proper in light of the role Congress wished to preserve for the States in the Program, the "notice" would be insufficient only if in fact substantial variance from the Congressional mandate continued thereafter.

Taking this view of the scope of the Secretary's discretion, plaintiffs could not, at this time, be granted relief under any view of mandamus and/or mandatory injunctions, as discussed above.

■ If the Secretary's present "notice", which takes effect September 1, 1969, does not have the effect of ending the present violations (which we assume *arguendo* to exist), this Court will be immediately faced with the question of whether relief in the nature of mandamus under § 1361 will be available. Until applications for reduced price or free lunches have been made and acted upon, we are unable to determine the effect of the Secretary's present exercise of his

authority. Therefore the motion to dismiss will be held in abeyance for 60 days. At that time both parties will be given an opportunity to reassert their views as to the facts and the law.

### 2. 28 U.S.C. § 1331: General Federal Question.

General federal question jurisdiction, unlike mandamus under § 1361, requires that $10,000 be in controversy. This rule applies to each plaintiff; aggregation of claims is not permitted in a F.R.Civ.P. 23(b)(3) class. Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). However, the intricacies of mandamus law should not be imported into a case arising under § 1331; the ancient rules have generally been productive of mischief and injustice (see *supra* at p. 1368) and there is no "policy" reason for importing them here. § 1331 constitutes an independent basis for jurisdiction so that it cannot be argued that granting a mandatory injunction under this section is an "evasion" of § 1361. Modern equitable principles have, in their own way, as great a regard for the smooth functioning of the government and its officials as do the common law restrictions on mandamus. The difference is that the former is more flexible and considers the merits of each controversy while the latter establishes categories and simply prohibits judicial scrutiny if the respondent's "discretion" is involved.

Although the cost of a school lunch is only thirty-five cents, the amount in controversy for the purposes of § 1331 is far greater. Plaintiffs' prayer is for injunctive relief, not damages, and in injunction cases the amount in controversy is the value of the right to be protected or the extent of the injury to be prevented. Pennsylvania R. Co. v. City of Girard, 210 F.2d 437 (6th Cir. 1954); 1 Barron & Holtzoff, Federal Practice and Procedure. (Wright ed.) sec. 24 n. 54. *Accord,* Connelly v. Univ. of Vermont and State Agricultural College, D.C., 244 F.Supp. 156, 159 (1965) (citing Barron & Holtzoff). As

Congress has expressly recognized, the right in question here is to good health, and to full physical and mental development. The preamble to the Act, 42 U.S.C. § 1751, states that one of its purposes is to " . . . safeguard the health and well-being of the Nation's children . . . ." *Cf.* 42 U.S.C. § 1771. *See also* House Report No. 1114 (90th Cong., 2nd Sess.) on the 1968 Amendments to the Act, P.L. 90–302, as reported in U.S.Code Cong. and Admin. News at p. 1934 (1968). Viewed in the light of this legislative history, these rights are not remote or incidental and the damages are not entirely speculative. Further, unlike diversity cases such as Snyder v. Harris, *supra,* these plaintiffs have no alternative forum in which to seek redress. If the Secretary of Agriculture owes them a duty, a state court would be unable to act against him. Even if a state court were able to entertain this suit, it would be anomalous for a federal court to be unable to hear a controversy principally involving federal law. As Professor Wright points out, there are exceedingly few federal question cases in which the $10,000 limit actually applies and when it does and is not met, the result is only to keep out of federal court a case in which it has special interest and expertise. Wright, Federal Courts 92–93 (1963). See also the discussion by Judge Friendly on this point in Murphy v. Colonial Federal Savings & Loan Association, 388 F.2d 609 at 614–615 (2 Cir. 1967). *Cf.* Empresa Hondurena De Vapores v. McLeod, 300 F.2d 222 (2nd Cir. 1962) (Friendly, J.) vacated on other grounds, McCulloch v. Sociedad National de Marineras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963):

> We do not pretend the distinction ["arising under" versus "claim created by"] to be altogether clear or satisfying; but if one line of cases or the other has to be favored, *considerations of good sense support those permitting the sphere of application of Federal statutes to be determined*

*by Federal courts. Id.,* 300 F.2d at 227. [Emphasis added].

### 3. 28 U.S.C. § 1337: Commerce Regulation.

■ A final alternative basis for finding jurisdiction over this controversy is § 1337, covering cases "arising under any Act of Congress regulating commerce. . . . " Jurisdiction under § 1337 would be free of the constraints of mandamus law for the same reasons that jurisdiction under § 1331 would be. In addition, § 1337 does not require any jurisdictional amount. Although the National School Lunch Program is not concerned directly with the regulation of interstate commerce, the preamble mentions encouragement of domestic consumption of agricultural commodities as one of its goals and the Act is intricately related to the Commodities Distribution Program, 7 U.S.C. §§ 612c and 1431. See U.S.Code Cong. and Admin.News at pp. 1932–1933 (1968) (1968 amendments to the Act further authorizing distributions of commodities obtained under price support and surplus removal operations). As the court stated in Murphy v. Colonial Federal S & L Ass'n, *supra,* " . . to found jurisdiction upon § 1337, it is not requisite that the commerce clause be the exclusive source of Federal power; it suffices that it be a significant one." 388 F.2d at 615. *Murphy* involved a controversy arising under the Federal Home Owners' Loan Act of 1933, 12 U.S.C. §§ 1461, 1464. As with the National School Lunch Program, the Home Owners' Act does not specifically mention or rely upon the commerce power but purposes involving it are clearly part of it. Although there are many older cases which give § 1337 a much narrower reading, this Court finds the reasoning of the Second Circuit persuasive. In addition to apparent Congressional approval for a broad reading of § 1337 in its 1958 amendments to the Judicial Code, sound policy militates against an interpretation which leaves a large number of federal question cases subject to the $10,000 requirement. See the dis-

cussion of this point, *supra,* under the § 1331 analysis.

In any event it is certain that this Court has jurisdiction under § 1361. As no action is to be taken for 60 days on the motion to dismiss, we need not finally decide at this time whether jurisdiction attaches under either of the other sections discussed.

### C. Indispensable Party.

In order to grant plaintiffs full and complete relief, it will be necessary to join the State of California. The Secretary of Agriculture has no power directly to "ensure" that the needy children get the free or reduced price lunches; he can only promulgate specific regulations and order that federal assistance be terminated if the regulations are not obeyed. Under the statute the State operates the program and only it can actually ensure that the lunches go to the proper recipients.

■ However, the State is not an "indispensable" party within the meaning of F.R.Civ.P. 19(b). This Court can "in equity and good conscience" grant relief if only as to the Secretary, assuming a proper showing is made. An order to the Secretary would not be wholly inefficacious in achieving the ends desired by the plaintiffs and since it would only relate to the duties owed by the Secretary, would not be fatally prejudicial to the interests of the State.

Nonetheless, the State of California has a direct interest in this matter and its joinder would make complete relief possible, if warranted on the merits. Thus the State appears to be a party which should be "joined if feasible." F.R.Civ.P. 19(a). The Court requests the parties to present argument on why it should not order the appropriate state officials joined under F.R.Civ.P. 21.

It might be noted in passing that the statute places a clear duty on a state accepting federal funds to administer the Program in a manner such that the needy children get the free or reduced price lunches. If merely complying with the

Secretary's regulations does not achieve this end, then a state would have to go further or it would be obligated to return the money.

### D. Secretary's Duty.

As the foregoing discussion indicates, the Court does *not* feel that the Secretary is without obligations to ensure compliance, despite the fact that the States have the initial duty to administer the Program in accord with Congresses' clear intention.

### III. SUMMARY JUDGMENT

At least until the effect of the Secretary's "notice" of October 18, 1968 on provision of the lunches is known, unresolved issues of fact remain in the case and therefore summary judgment is inappropriate.